ELISHA PERKINS *versus* PORTLAND, SACO AND PORTSMOUTH RAILROAD COMPANY.

A railroad company may be bound, by a special contract, (but not otherwise,) to transport persons or property beyond the line of their own road.

Although the power to make such a contract is not expressly granted by the Act of incorporation, it may be conferred by implication, as necessary to the proper and profitable exercise of the powers specially enumerated in the charter.

A company may be thus bound, without any actual arrangement with connecting lines, if, by their agents, they hold themselves out to be common carriers to a place beyond the limits of their own road.

If such agents so represent the company to the public, in such a manner, and for such a length of time, that the corporators may be presumed to know and assent to it, the company would be estopped to deny it.

Although the company may have no special authority, by their charter, to make such contracts, and could, perhaps, by proper proceedings, have been enjoined or restrained from doing it, they cannot plead such want of authority against persons contracting with their agents, empowered so to contract by express act of the company or their directors, or by implication arising from a mutual arrangement amongst all the carriers between the place where the goods are received and the place of delivery.

And, although the agent making such a contract had no authority, express or implied, from the company, yet, if he had for several years, before and after the case in suit, practised making similar contracts to deliver goods at various places beyond the line of the company's road, their assent may be presumed, and they will be estopped from denying his authority.

In such a case, the measure of damages is the value of the goods at the place of delivery, less the cost of transportation, if unpaid.

ON AN AGREED STATEMENT.

This is an action against the defendants, as common carriers, upon the following contract in writing, made on behalf

of the company, by J. S. Works, their agent and station master, at their depot in Biddeford:—

" Office of P. S. and P. R. R., Biddeford, Me., Aug. 27, 1855.

" Received in apparent good order from Mrs. Sarah A. Perkins, 8 Boxes, 4 Chests, 11 Pkg. Furniture, marked E. Perkins, Bloomington, Ills., which we promise to deliver to Elisha Perkins, in Bloomington, in like order.

" J. S. Works, <em>Station Agent.</em>"

The defendants are common carriers by railroad between Portland, Maine, and Boston, Massachusetts, but deny their liability beyond the *termini* of their road. The goods were lost by collision on Lake Michigan, while on board of a steamboat, being conveyed to Bloomington, Illinois.

The plaintiff introduced the deposition of Sarah A. Perkins as to what were the articles delivered to the defendants to be forwarded, the circumstances attending the delivery, what were the articles which reached Bloomington, and what articles were never received there, and their value.

The defendants introduced Ichabod Goodwin, president of the company, and John Russell, jr., superintendent, who testified that the station agents had never been authorized to bind the company to deliver goods beyond the termini of the road; that they had no power to authorize the agents to do so; that their road had no connection with the roads beyond Portland and Boston, and had never held itself out as a common carrier beyond those termini, nor undertaken to deliver goods beyond them; that, when goods were received by them to be forwarded beyond Boston, and the freight not paid, the custom was to collect the freight on delivery of the goods to be forwarded; that the company had never assumed any responsibility for goods after delivery to the next company, nor acted in any capacity beyond their line of the road, except as forwarders of goods; that they had never made any special contracts with the Saco Water Power Company, nor was any other person authorized to make such contracts; nor were they aware that any of their employees delivered goods for that company beyond the limits of their road.

The testimony of W. H. Kenney, general freight agent of the Eastern Railroad, at Boston, tended to corroborate the foregoing. He further stated that when he delivered goods to other companies, to be sent west of Boston, he had taken receipts of those companies; and that the freight on these goods, from Biddeford to Boston, was paid to him by the Boston, Worcester and Western Railroad Company, when he delivered the goods to them to be forwarded.

*J. S. Works*, called by the defendants, testified as follows :

" I reside at Biddeford, am station agent of the P. S. and P. Railroad Company; have been for six years. As station agent, I receive and forward freight, and sell tickets to passengers. I received certain goods from Mrs. Perkins, in August, 1855, to forward to Illinois, marked "E. Perkins, Bloomington." I gave her a receipt for them to be delivered to him at Bloomington. I suppose the receipt reads so. I had no authority any further than Boston. I had never, that I know of, given a receipt beyond Boston, before or since. Previous to that time I had given but few receipts, and that was an error. No officer of the road told me I might do so. I have never before or since known any such receipt given by any other agent of the road."

*Cross-examination.*—"I am now, and was in 1855, the sole station agent of the P. S. and P. R. R. Co., at Biddeford. For the last three or four years, a large amount of freight has been sent from the depot at Biddeford over the road — more than previously. During all that time, all the freight that was received there to be forwarded was received by me. I was the only one to whom application could be made. I made all contracts for the carriage of freight.

" In the instance of the goods received to be forwarded to Mr. Perkins, the freight was not prepaid. The usual practice for those who send goods beyond Boston, was to pay at either place, Biddeford or Boston. Mrs. Perkins may have asked me what the freight would be, but did not offer to pay it. I think I did not tell her that the whole freight could be paid at Bloomington, because, when any one has offered to

pay me freight, I have usually taken it. I think I told her that the freight could be paid by each company through whose hands the goods passed, to the next previous company, and the last company collected the whole bill of the owner of the goods. I took the form of the receipt from one that Mr. Milliken, the station agent before me, had used for Boston only. I had not at that time a book of forms from which I made up receipts. During the years 1854, 1855 and 1856, I was in the habit of receiving more or less goods from the Saco Water Power Co. I was in the habit of signing receipts to the Saco Water Power Co. The receipts that I gave to them were different from the receipts I gave to others. The difference was that they were printed; no other difference in the form from those I usually gave to persons for whom we carried freight. I think there was no different contract made with the Saco Water Power Co., than with other persons, in regard to delivery or carriage of goods. If the Saco Water Power Co. sent freight to be delivered to some place off the line of the road, we dealt with them the same as with other persons, gave a receipt binding the Company to Boston only.

"I never gave half a dozen receipts to other persons outside of the Saco Water Power Co., until the Laconia Co. commenced taking receipts.

"I did receipt for the Saco Water Power Co., off the line of the road. [Here certain receipts or contracts for the transportation of freight to places off of the line of the defendants' road were shown to the witness by the plaintiff's attorney, and testified to as signed by him and given to the Saco Water Power Co.] I receipted for them different from what I did for others. I now do not write receipts for any one; those who send the goods furnish the receipts; if goods going to Boston, they are written to deliver in Boston, if farther, written to be forwarded.

"I have not had any instructions about the manner of writing my receipts since the commencement of this suit. The contract that I signed and delivered to Mrs. Perkins was all in my handwriting."

Perkins *v.* Portland, Saco and Portsmouth Railroad Co.

*Direct examination resumed.* — " I have no discretionary power as to the prices of freight, never have had. The receipts given to the Saco Water Power Co., were never written by me. They were brought to me all printed, and filled out; all I had to do was to sign them at that time. Since that, I have interlined them.

" Previous to Perkins' sending their goods, I do not recollect of given a receipt to any body except the Saco Water Power Co. That was the first one that I ever wrote, to my recollection. I receive my directions from the Superintendent. I have always received freight, when it was offered, in advance as far as I way-billed, — I way-billed these goods to Boston. I have received from time to time printed instructions as to my duties as station agent. I received the same kind of instructions previous to August, 1855, as these. [Here the witness referred to a printed book of rules and regulations, 1855, a copy of which was exhibited.] I was acting under these instructions in August, 1855."

*Cross-examination continued.* — "I did not communicate to Mrs. Perkins my instructions. I do not know who paid, or whether any one paid the freight on these goods."

The plaintiff introduced written agreements signed by J. S. Works, as the defendants' station agent, to the number of ninety-four, given at various times in the years 1854, 1855, and 1856, and one in the year 1857, to the Saco Water Power Company, in which the defendants promise to deliver goods at various places off the line of their road, in Maine, New Hampshire, Massachusetts, Connecticut and Canada.

These agreements are all similar in form to the following, which is a copy of one of them : —

"Marks and numbers. | Office of the Portland, Saco and Portsmouth R. R. Co., Biddeford, September 7, 1855.

J. G. COBURN, Esq., Ag't Hill Mill, Lewiston, Me. | Received in good order from the Saco Water Power Co.'s Machine shop, 1 SHAFT and 1 PAIR COUPLINGS, marked as in the margin, which we promise to deliver in like order, in Lewiston, Me., to J. G. Coburn, Esq., agent Hill Mill, or order.

J. S. WORKS, Station Agent."

If the Court, upon the case stated, shall determine that the plaintiff can maintain his action, they are further to determine whether the rule of damages in this case shall be the value of the goods lost, or not delivered, at Biddeford or Bloomington, or what other rule of damages is applicable to the case, and the defendants are to be defaulted, and judgment is to be rendered for the plaintiff for his damages and costs; but, if the Court shall decide that the action is not maintainable, the plaintiff is to become nonsuit.

The plaintiff's damages are to be assessed by a commissioner appointed by the Court for that purpose, who shall determine the value of the goods lost, or not delivered, from · the depositions now taken in the case, which either party may produce before him, and such other legal evidence as may be adduced by either party, the value to be found according to the rule determined by the Court as applicable, and, in default of a decision of said commissioner, by death or any other cause, the damages may be assessed by the presiding Judge, in the same manner as above named.

*Goodwin & Fales*, for the plaintiff.

The execution of the contract, the delivery of the goods to the defendants, their character as common carriers, the agency of Works, and the loss of the goods, being admitted, the plaintiff's case is made out. Works being admitted to be agent, the law will presume him to be a general agent, until the contrary is shown. *Methuen Co.* v. *Hays*, 33 Maine, 169. And the defendants, as common carriers, having received the goods under one entire contract to deliver them at a certain place, their liability as common carriers continued until delivery at that place. *Hyde* v. *Trent & Mersey Nav. Co.*, 5 Term Rep., 389 ; 2 Greenl. Ev., § 210 ; Story on Bailments, § 538.

In answer to anticipated objections, the counsel argued the following points :—

1. Railroad companies, in case of the loss or non-delivery of goods intrusted to them as common carriers, under such a

contract as disclosed in this case, may be responsible to the owner, if lost while in transit, though beyond their own lines. Redfield on Railways, 291; Story on Bailments, § 533; *Muschamp* v. *L. & P. Junc. Railway,* 8 M. & W. Exc. Rep., 421; *Watson* v. *A. N. & B. Railway,* 3 Eng. L. & Eq. R., 497; *Crouch* v. *Lancaster & N. W. R. R.,* 25 Eng. L. & Eq. R., 287; *Crouch* v. *London & N. W. R. R.,* 4 C. B., 255 (78 E. C. L. Rep.); *Fowler* v. *Great Western Railway,* 7 Welsby, H. & G. Exch., 698; *Crouch* v. *same,* ib. 705; *Jordan* v. *Fall River R. R. Co.,* 5 Cush., 69; *Nutting* v. *Conn. River R. R. Co.,* 1 Gray, 502; *Fitchburg & Worc. R. R. Co.* v. *Hanna,* 6 Gray, 539; *Farmers' and Mech. Bank* v. *Champlain Transp. Co.,* 18 Verm., 140, and 23 Verm., 209; *Noyes* v. *Rutland & Burl. R. R. Co.,* 27 Verm., 110; *Weed* v. *Sar. & Schen. R. R. Co.,* 19 Wend., 534; *Van Santvoort* v. *St. John,* 6 Hill, 157; *Wright* v. *Boughton,* 22 Barb., 561; *Hart* v. *Renss. & Saratoga R. R.,* 4 Seld., 37; *Bennet* v. *Filyam,* 1 Florida, 403; *Jennerson* v. *Camden & Amboy R. R. Co.,* 4 Am. Law Reg., 234, and note of the editors; *Check* v. *Little Miami R. R. Co.,* decided in Ohio in 1859.

2. As to the authority of Works to bind the company, the liability of the principal depends, not upon his instructions to the agent, but upon the question whether the latter was a general or special agent. *Hatch* v. *Taylor,* 10 N. H., 538; *Anderson* v. *Coonley,* 21 Wend., 279. Works was the defendants' general agent for receiving freight and making contracts for its transportation, the only person to whom application could be made for those purposes at one of their principal stations. As between himself and the company, he might be bound by their instructions; but as between them and the owner of goods having no notice of the instructions, a contract made by him as agent would be valid, though made in disregard of those instructions. Story on Agency, 4th ed., § § 17, 18, 19, 73, 126, 127, 128, 131, 132 and 133. A special agency exists when authority is delegated to do a single act; a general agency, when the authority is to do all acts connected with a particular employment. Story on

Agency, § § 17, 127, note; *Trundy* v. *Farrar*, 23 Maine, 227; Paley on Agency, by Lloyd, 199, note. A third person has a right to assume, without notice to the contrary, that one employed generally by a railroad company, as its station agent, has authority to act for his principal in all matters within the scope of his employment; and, if he is clothed with apparent authority for certain purposes, he may bind his principal within the limits of his apparent authority, otherwise there would be no safety in mercantile transactions. *Pickering* v. *Bush*, 15 East, 38.

The printed instructions do not affect the case. They do not forbid the agent to make the contract in this case; and if they did, they are private, for the guidance of the agent, and his office and authority are distinct, and not derived from the instructions. The instructions are subsequent, collateral and varied from time to time. The plaintiff had no notice of them, and they cannot affect this contract. *Wilson* v. *York, Newcastle & Berwick Railway Co.*, 18 Eng. L. & Eq. R., 557; Redfield on Railways, 291.

The American decisions do not go to the full extent of the English, and have not held companies liable for the delivery of goods beyond the terminus of their line, except upon express contract. In no case, however, have they denied the authority of a general agent, like a station agent, to make such a contract.

3. The defendants are estopped from denying the authority of Works to make the contract. They had, for four years prior to this transaction, through their station agent, been accustomed to contract for the transportation of goods in the same manner as in this case. The evidence shows a large amount of business done in this way. It is reasonable to presume that their manner of doing business, in this respect, was well known at Biddeford, and that the company increased their business and profits thereby. By their acts, the plaintiff was induced to give them credit as carriers for the entire distance. *Weed* v. *S. & S. R. R. Co.*, 19 Wend., 337.

Perkins *v.* Portland, Saco and Portsmouth Railroad Co.

If the president and superintendent did not know that business was done in this manner, it was their duty to inform themselves of their agent's manner of doing business, and the plaintiff is not to suffer by their neglect. Besides, it does not appear that the directors were equally ignorant; but, if they were, it is immaterial. Story on Agency, § 127, note; Parsons' Merc. Law, 217; 27 Verm., 110. The same agent has been retained in their employ to the present time, and *without any new instructions.*

4. It cannot be doubted that the company had power, under their charter, to make this contract. Railroad corporations have such power, if not expressly granted. Redfield on Railways, 287; *Noyes* v. *Rutland & Burl. R. R. Co.,* 27 Verm., 110; *Jennerson* v. *Camden & Amboy R. R. Co.,* 4 Am. L. Reg., 235, and the editor's note; opinion of WAITE, C. J., in *Elmore* v. *Naugatuck R. R.,* 23 Conn., 457; *Steamboat Co.* v. *McCutchin,* 13 Penn., (1 Harris,) 13.

It is true that corporations have only such powers as are specifically granted by their charters. An act of a corporation entirely foreign to the purposes of its institution, is void from want of power. But, on the other hand, when a right is given, all the powers necessary to the exercise and enjoyment of it are also given. 15 Barb., 9. And this includes, not only those without which the right given could not be exercised, but all which are adapted to the convenient, profitable and reasonable use of the powers, or enjoyment of the rights expressly granted.

The question is, whether the right assumed by the defendants to contract to carry goods over their road, and deliver them at a place off of their line, is within their chartered powers, or foreign to the purposes of their incorporation. No matter whether the place of delivery is in Maine, or Illinois, ten miles from their track, or a hundred, or a thousand. Not only is such an act one not foreign to the purposes of their charter, but it is one adapted to those purposes, natural and reasonable, and one without which the privileges of the company could not always be enjoyed. It is a power which may

be abused, but not more liable to be so, than many other undoubted powers.

In a country like this, its various sections so connected by business, and interlaced with railroads, public policy demands that a construction should be given to the powers of corporations, in accordance with the usages of the country, and the interests of the commercial public. In almost every State, the construction has been given which is here contended for. In Connecticut only, the Court being divided, the majority decided against the power of railroad corporations to make such contracts, WAITE, C. J., dissenting.

The Court in this State has already decided this point substantially, and by implication, in *Perkins* v. *E. & B. & M. R. R. Co.*, 29 Maine, 307; *Sager* v. *P. S. & P. & E. R. R. Co.*, 31 Maine, 228.

The defendants are every day contracting to carry goods beyond the terminus of their road at Portsmouth, to Boston, and their power to do so is not denied or doubted.

The rule of damages is the value of the goods at their place of destination, at the time when they ought to have been delivered there. Chitty on Contracts, 393; *Day* v. *Day*, 9 Wend., 129; *Shaw* v. *Nudd*, 8 Pick., 9; *Smith* v. *Berry*, 18 Maine, 122; *Wells* v. *Abernethy*, 5 Conn., 222; *Mitchell* v. *Gile*, 12 N. H., 394; *Nourse* v. *Snow*, 6 Greenl., 208.

*Philip Eastman*, for the defendants, reviewed the provisions of their Act of incorporation, and argued that the corporation was established only for the purposes of building a railroad from Portland to the New Hampshire line, to connect with a road from Portsmouth to Boston, furnishing the road with necessary equipments, and transporting persons and property in its cars between the two termini. The corporation are to enjoy the privileges conferred by their charter, in return for which the public is to enjoy the accommodations resulting from the building of the road. The powers of the corporation are to be exercised by the president and directors.

A corporation has no other powers than such as are spe-

cifically granted, or are necessary for carrying into effect the powers granted. Its general powers are restricted to the nature and objects of its institution. Angell and Ames on Corp., 66; *Beattie* v. *Knowles' lessee,* 4 Peters, 150; *Bank of Augusta* v. *Earle,* 13 Peters, 519.

Should the president and directors attempt to build a railroad any where else than is authorized by their charter, the corporation would not be bound by their acts or contracts; and the Court, on application, would enjoin them from proceeding. So, if they should undertake to purchase engines or other materials for another railroad.

Their power to receive toll is limited to persons and property transported over the railroad. What, then, is their power to carry, or bind the company to carry, goods beyond the termini of the road? It is contended that their power to carry goods extends just so far as their power to build and equip a railroad, and that their power to bind the corporation by a contract to convey goods is coëxtensive and coterminous with their power to provide the means of conveyance.

It is admitted that, as the charter provides for a connection with the road from Portsmouth to Boston, Boston may, by a liberal construction, be regarded as the terminus of this road, and that the authority to connect may imply authority to unite in transporting goods on the connecting roads. And further, the company may have incidental power to provide carriages and send for goods to be carried by them, and for conveying and delivering the goods to the consignees and owners near the terminus of their route, or at and to the receiving stations of railroads or other conveyances for transportation to more distant places. But the power of the president and directors to contract to carry beyond the termini of the road, except so far as incidental to the nature and objects of the institution, is denied.

The plaintiff's declaration describes the defendants as common carriers, without naming the terminus at either end of the route. He does not charge them as common carriers

from Biddeford to Bloomington, Illinois. He should not only declare, but *prove*, that they are common carriers from the place where they received the goods, to the place of delivery, or at least to the place where the loss took place.

In admitting that the defendants are common carriers between the termini of their road, we admit that, upon this route, and within the sphere of their business, they become insurers of the goods intrusted to them to be carried, against loss or injury, unless by the act of God or of the public enemy. This has been the settled rule of law, since the old and leading case of *Coggs* v. *Bernard,* 2 L'd Raym., 909; Angell on Carriers, c. 4, § 67; *Riley* v. *Howe,* 5 Bing., 217; *Boyce* v. *Anderson,* 2 Peters, 150.

The rigorous responsibility imposed on the common carrier is justified on the ground that he, by implication, undertakes to carry the goods personally, or by servants for whose carefulness and honesty he is willing to be responsible.

In the present case, the case finds that the goods were lost by collision on Lake Michigan, more than a thousand miles beyond the western terminus of the defendants' route.

The position already taken, that the Act of incorporation is the measure and limit, not only of the duties and obligations, but of the powers of the president and directors in the management of the affairs of the company, and that they had no authority to extend their business as carriers beyond the limits to which they were restricted by their charter, for building and equipping their road, is fully sustained by the decision in *Hood* v. *N. Y. & N. Haven Railway Co.,* 22 Conn., 1 and 502; also in *Elmore* v. *Naugatuck R. R. Co.,* 23 Conn., 457, and *Naugatuck R. R. Co.* v. *Waterbury Button Co.,* 24 Conn., 468; and is settled law in that State.

In Vermont, it has been held that a railroad company may be bound by a contract to receive and transport goods outside of the limits of their road. *Noyes* v. *Rutland & Burl. R. R. Co.,* 27 Verm., 110. In that case, the company had undertaken to send their barges to certain places for a quantity of hay to be transported on their road. The Court up-

held the contract, " on the ground of usage and convenience, or common understanding and consent." REDFIELD, C. J., in his treatise on the law of railways, justifies the decision, on the ground that the power as exercised was incidental to the powers conferred on the companies, and necessary to their exercise in a reasonable and practicable mode. It does not follow that the company would be bound by a contract, unless so nearly within a strict construction, as to be necessary to the management of their general and ordinary business. 1 Parsons on Contracts, 120; 3 Eng. L. & Eq., R., 420.

No case can be found where a company has been held bound by a contract to carry goods beyond their own road, except so far as incident to the general objects of their incorporation, or necessary for the convenient exercise of the powers granted, or where two or more roads are connected as parts of the same route, and have formed a kind of partnership to receive payment for freight and give tickets through. Redfield on Railways, § 135; *Far. & Mech. Bank* v. *Champlain Tr. Co.*, 23 Verm.; 186; *Van Santvoort* v. *St. John*, 6 Hill, 158; *Fitchburg & Worc. R. R. Co.* v. *Hanna*, 6 Gray, 539; *Nutting* v. *Conn. River R. R. Co.*, 1 Gray, 503.

In this State, there has been no case in which the extent of the power of a railroad company to contract to carry goods has been determined. It remains for this Court to decide what construction shall be given to such Acts of incorporation here. The interests of the community require such a limitation of powers as expressed by the Supreme Court of the United States in 4 Peters, 150, already cited. It should be within the manifest intention of the charter, having reference to the objects for which it was granted. Good faith to stockholders of corporations requires that wholesome restrictions should be observed. If a corporation created to build a road fifty miles, from Portland to Portsmouth, may become common carriers to Bloomington, 1300 miles distant, and in steam propellers that the stockholders never heard of, across Lakes Erie, Huron and Michigan, who can be safe in

calculating results? The Act of incorporation, intended as a shield to protect the stockholders and the public from fraud and imposition, becomes a snare to entrap both. If the power exists to the extent contended for, there is no limit, but the company may assume the responsibility of common carriers to California, the Sandwich Islands, Japan, China and all parts of the world.

Without an express contract, the carrier is only liable to the extent of his own route, and for safe storage and delivery to the next carrier. Redfield on Railways, § 135, and other authorities before cited; *Ackley* v. *Kellogg*, 8 Cowen, 223; *Garside* v. *Trent & Mersey Tr. Co.*, 4 Term R. 581; *Husfield* v. *Adams*, 19 Barb., 577.

To give effect to the receipt given by Works, the plaintiffs must show, not only that the company and its directors, but that Works had power to make such a contract. Corporations, like natural persons, are bound by the acts of their agents only within the scope of their authority. Angell & Ames on Corp., 239, § 9; *Mech. Bank of Alex.* v. *Bank of Columbia*, 5 Wheat., 337; *Salem Bank* v. *Gloucester Bank*, 17 Mass., 1; *Sewall* v. *Allen*, 6 Wend., 335; *Citizens' Bank* v. *Nantucket St. Co.*, 2 Story's C. C. R., 16; Angell on Carriers, c. 4, § 102. It is shown, by the testimony of the president, superintendent, and Works himself, and by the printed regulations, that the station agent had no authority to make such a contract. The usage or course of business of the company is proved by the testimony of Goodwin, Russell and Kenney, to have been against such contracts. When an agent makes a contract out of the line of his employment, and contrary to the common course of business, and published regulations, it will not bind the company. Redfield, § 137; *Elkins* v. *B. & M. R. R. Co.*, 3 Foster, 275.

The plaintiff introduces a large number of receipts given by Works to the Saco Water Power Co., contracting to deliver goods off of the line of the road. He does not show that any of the goods were so delivered. The receipts were all given by one station agent to one party, without the

knowledge of any officer of the company. This evidence fails to show any usage or course of business, or any sanction by the company. The receipts were in printed forms, brought to him already filled, and were signed without his being aware of their meaning.

It is not pretended that the defendants ever carry goods beyond the terminus of their route, but that they contract that they shall be safely carried to their place of destination. This would make them insurers of the goods after they pass from their hands until they are delivered in Bloomington, although they receive freight or pay only to Boston. There is no apparent reason to believe the plaintiff or the defendants, when this receipt was given, imagined that the latter were to guaranty the safe transportation of the goods for the whole 1300 miles, or, indeed, do any thing more than transport them to Boston, and forward them by the next line on the usual route to Bloomington, each carrier on the route being responsible directly to the plaintiff for safe transportation to the end of his own route. *N. J. Steam Navigation Co.* v. *Mer. Bank*, 6 Howard, 344; Greenl. on Ev., § 210.

The opinion of the Court was drawn up by

DAVIS, J. — This is an action against the defendants as common carriers, for the value of a quantity of furniture received by them for transportation. The goods were delivered to the station agent at Biddeford, who gave a receipt for them, of which the following is a copy.

" *Office of P. S. & P. R. R. Biddeford, Me., Aug.* 27, 1855. Received, in apparent good order, from Mrs. Sarah A. Perkins, 8 boxes, 4 chests, 11 packages furniture, marked *E. Perkins, Bloomington, Ills.*, which we promise to deliver to Elisha Perkins in Bloomington, in like good order.

" J. S. Works, *Station Agent.*"

The furniture was carried by the defendants to Portsmouth, and sent thence to Boston, by an arrangement between them and the Eastern Railroad Company, by which the two corporations mutually conduct their business. The defendants do not

appear to have had any care, or to have exercised any control, directly or indirectly, over the property, after it was delivered in Boston. No freight was advanced, nor any rate or sum agreed upon. It was probably understood that the defendants were to receive their usual rates to Boston. From that place the furniture was forwarded from one point to another, by the different railroad or steamboat companies on the line; and, at the time of the loss, by collision, it was on board a steamer on Lake Michigan.

That Works was the general agent of the defendants, to contract for the transportation of freight and passengers from the Biddeford station, admits of no doubt. The only question, therefore, is, whether the company were bound by his contract to deliver the goods in Bloomington, in the State of Illinois. Had any agent of the company any authority to make such a contract?

The defendants were incorporated in 1837, with authority to construct a railroad from Portland to Portsmouth, and to exercise their corporate powers " for the transportation of persons, goods, and property of all descriptions." And it is argued that the corporation being the creature of the law, with no powers but those conferred by law, its agents could not bind it by any contract to transport persons or property, except upon its own line of railroad; — that the company had no authority to become common carriers on other routes, and in other States, and that any agreement to do so, being beyond the scope of the corporate powers, was void.

The question is one of great practical importance, upon which there has been some diversity of opinion.

It is quite clear that a common carrier, if a natural person, may contract to carry persons or property beyond his own line, and thus make the carriers upon the connecting lines his agents. In such case he is responsible for any loss or injury upon any part of the route. Story on Bailments, § 558; 1 Parsons on Contracts, 687; Smith's Mer. Law, 367; Parsons' Mer. Law, 217.

Whether the same rule applies to corporations, chartered

as common carriers upon lines designated in the statutes by which they are created, is not so clearly settled. In England, the law is well established, by a series of decisions, not only that the same rule applies to railway companies *as to* natural persons, but that, in either case, if a common carrier receives goods marked to be delivered at a place beyond the limits of his own line, he undertakes, *prima facie,* to carry the goods to their destination, and is bound to do so, unless he limits his responsibility by express agreement or notice at the time the goods are received. *Muschamp* v. *L. & P. Railway Co.,* 8 Mees. & Wels., 421; *Watson* v. *A. N. & B. Railway Co.,* 3 Eng. Law & Eq., 497; *Wilson* v. *Y. N. & B. Railway Co.,* 18 Eng. Law & Eq., 557; *Crouch* v. *L. & N. W. Railway Co.,* 25 Eng. Law & Eq., 287.

This doctrine has been denied in this country; and the rule has been held to be, when a railway company receives goods marked for delivery at a place situated beyond the line of their own road, that they are only bound, in the absence of any special contract, to transport and deliver them, according to the established usage of the business, to the carriers of the connecting line, to be forwarded to their ultimate destination. *Nutting* v. *Conn. River R. R. Co.,* 1 Gray, 502; *Van Santvoord* v. *St. John,* 6 Hill, 157; *Bank* v. *C. Trans. Co.,* 18 Verm., 140; 23 Verm., 209; *Jennerson* v. *C. & A. R. R. Co.,* 27 Penn. State R.

In all these cases, it is decided or admitted that a railroad company may, *by special contract,* bind themselves to deliver merchandise at a place beyond the line of their own road; and that, in such case, they are bound as common carriers for the whole route, and can exonerate themselves only by a delivery at the place of destination. But in none of the English cases cited, except the last one, was any question raised in regard to the power of the company under their charter. In that case, though this point was presented, and the contract was to carry goods to a place beyond the realm, the company were held liable as common carriers, on the

ground *that they held themselves out to the public as common carriers to that place.*

Nor was this question directly presented in any of the American cases before cited. But the point was raised in a later case, *Noyes* v. *R. & B. Railroad Co.*, 27 Verm., 110, and it was held that a contract to send barges to a place, not on the line of their road, for a quantity of hay, and to transport it from that point over their road, was within the scope of the powers conferred by the charter, and that the company were bound by it. REDFIELD, C. J., the learned author of the treatise on Railways, in delivering the opinion of the Court, says, "it may be true, in one sense, that this is extending the duties and powers of the company beyond the strictest interpretation of the words of the charter. But the time is now past, when, as between the company and strangers, any such literal interpretation of the charter is attempted to be adhered to."

In the case of *Hood* v. *N. Y. & N. H. R. R. Co.*, 22 Conn., 502, it was held that a contract to carry a passenger from New Haven to Farmington on their railroad, and thence to Collinsville by stage, was not binding on the company, on the ground that the company had no authority, under their charter, to make a contract to carry a person beyond their own line. We are not aware that the doctrine has been carried to this extent in any other State.

Upon a careful survey of all the authorities, we are satisfied that a railroad company may be bound, by a special contract, to transport persons, or property, beyond the line of their own road. In granting the charter, all incidental powers, which are necessary to the proper and profitable exercise of those which are specially enumerated, may be presumed to be conferred by implication. The business of common carriers between different places is intimately interwoven, branching off into innumerable channels. And it is often of great public convenience, if not of absolute necessity, that several companies should combine their operations,

and thus transport passengers and merchandise, by a mutual arrangement, over all their lines, upon one contract, for one price. In such cases each is held liable for the whole distance. *Fairchild* v. *Slocum*, 19 Wend., 329; *F. & W. Railroad Co.* v. *Hanna*, 6 Gray, 539.

And we think a company may be bound, even without any actual arrangement with the connecting lines, if, by their agents, they hold themselves out to the public as common carriers to a place beyond the limits of their own road. If such agents so represent the company to the public, in such a manner, or for such a length of time, that the corporators may be presumed to know it, and therefore, to assent to it, the company would be estopped from denying it. In the language of REDFIELD, C. J., in the case before cited, " if the corporators acquiesce in the extension of the business of the company, even beyond the strict limits of its charter, and strangers are thereby induced to contract, upon the faith of the authority of the agents of such company, the company are not at liberty to repudiate the authority of such agents, when their transactions prove disastrous."

The application of these principles to the case at bar, is not free from difficulty. The plaintiff relies upon a special contract to deliver his goods in Bloomington, in the State of Illinois. The place of delivery being far beyond the line of transit under the control of the defendants, it is not sufficient for the plaintiff to prove that the contract was made by one of their subordinate agents. The authority of such agent to make such a contract must be proved.

This might be done by proof of express authority, conferred by the corporation, or by the directors. And, though the company might have had no special authority, by their charter, to make such contracts, and could, perhaps, have been enjoined or restrained from doing it, by proper proceedings, they could not plead such want of authority against persons so contracting with them. To do so would be taking advantage of their own wrong. But the evidence in this case, which is submitted to us upon a report of the testimony, fails to

prove any express authority on the part of the agent to make such a contract with the plaintiff.

If there was no express authority, it might have been implied from a mutual arrangement for the carrying business among all the carriers between the point where the goods were received, and the place of delivery. Where such an arrangement actually exists, there is an implied authority on the part of the agents of each company to make a contract that shall bind them all. But the evidence in this case is conclusive, that no such arrangement existed between the defendants and other companies for the transportation of persons or property to any place beyond Boston.

If the agent who made the contract had no authority, in fact, therefor, either express, or implied, have the company so conducted their business, by holding themselves out to the public as common carriers to places beyond the line of their own road, that they are estopped from denying such authority?

There is considerable evidence upon this point. It appears that this same agent, during a period of several years, both before and after August 27, 1855, made contracts similar to the one in suit, to deliver goods at various places beyond the line of the defendants' road, in this State, in Massachusetts, in Connecticut, and in Canada. Such contracts made *after* the one in suit are, perhaps, inadmissible as evidence on this point. But the nature of these contracts, and the manner of doing business, must have been known by the directors, and by many of the corporators. And their assent may be presumed from the fact that the agent, for so long a time, was permitted to have charge of the business and make such contracts. From these and other circumstances, a majority of the Court are of the opinion that strangers had the right to conclude that he was acting within the scope of the authority conferred upon him by the company, and that the company are therefore estopped from denying it. According to the agreement of the parties judgment must be entered for the plaintiff, for the

value of the goods at the place of delivery, less the cost of transportation, no freight having been paid.

TENNEY, C. J., and RICE, APPLETON, GOODENOW, and KENT, JJ., concurred.